UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT BABJAK, | |
| Plaintiff, | Case No. 17-cv-6696 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| TOM CHRISTIE, | |
| Plaintiff, | Case No. 17-cv-6919 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| DOUG SCHAUMBURG, | |
| Plaintiff, | Case No. 17-cv-7165 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| JAMES WARING, | |
| Plaintiff, | Case No. 17-cv-7166 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |

1

| | |
|---|---|
| JACK BAUERLE, | |
| Plaintiff, | Case No. 17-cv-7283 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| KATE MCKINLEY, | |
| Plaintiff, | Case No. 17-cv-8255 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |
| MICHAEL COLEMAN, | |
| Plaintiff, | Case No. 17-cv-8259 |
| v. | |
| ABBVIE, INC., | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

In seven related cases, Plaintiffs Scott Babjak, Tom Christie, Doug Schaumburg, James Waring, Jack Bauerle, Kate McKinley, and Michael Coleman sued Defendant AbbVie, Inc.—their former employer—alleging that Defendant fired them in violation of the anti-retaliation provision of the False Claims Act (FCA). This Court consolidated briefing for all seven cases and Defendant moved to dismiss every complaint for failure to state a claim. For the reasons explained below, this

2

Court grants Defendant's motion in its entirety.

I.   The Complaints' Allegations[1]

Plaintiffs previously worked for Defendant as pharmaceutical sales managers. [SB] ¶¶ 1–2. Specifically, they managed teams selling Lupron, a drug covered under Medicare Part B. [KM] ¶¶ 23, 80. Before Defendant fired them, each Plaintiff had a successful career in sales and consistently received positive performance reviews. *Id.* ¶¶ 30–33; [JW] ¶¶ 27–30.

According to Plaintiffs' allegations, drug sales representatives cannot directly discuss profits with physicians. [SB] ¶ 69; [MC] ¶ 92. Part of Defendant's sales force for the drug Depakote violated this rule years ago, leading Defendant to enter into a corporate integrity agreement in 2012 with the Office of the Inspector General in the Department of Health and Human Services (DHHS). [SB] ¶¶ 30–33. That agreement, in force for five years, required Defendant to have an employee from each business unit certify that they understood the applicable compliance requirements and had "taken steps to promote such compliance." *Id.* ¶ 35.

Under the agreement, Defendant also had to provide special training to some employees, which it failed to do. *Id.* ¶¶ 36–38. Defendant did not train its sales force on handling pricing discussions with physicians. *Id.* ¶ 39. That failure matters because physicians can use a drug's average sales price (ASP) and Medicare's publicly available reimbursement rates to calculate profits. *Id.* ¶ 75.

---

[1] In this opinion, citations to docket numbers refer to filings in Babjak's case, No. 17-cv-6696. This Court cites each Plaintiff's complaint by their respective initials. Because Plaintiffs' complaints contain largely identical allegations about Defendant's business and their work for Defendant, this Court sometimes cites one complaint for a proposition that applies to all Plaintiffs.

In 2013, Defendant implemented an "aggressive" new sales model for Lupron that required sales representatives to understand their customers' economics and "be bold in discussing price and financials" with physicians. [JB] ¶¶ 44, 49–50. Again, Defendant failed to train its sales force on what they could and could not say to physicians about drug prices. *Id.* ¶ 51. The training that Defendant offered on messaging, however, "clearly allowed representatives to discuss pricing" in certain contexts with physicians. *Id.* ¶ 53. After implementing the new sales method, Defendant praised Plaintiffs for their understanding of physician economics and Lupron's market position. *Id.* ¶ 58; [TC] ¶ 53.

At some point during the second half of 2016, Defendant received a letter from Tolmar, the company that manufactures Lupron's main competitor. [TC] ¶¶ 61–62. The letter accused Defendant of using "illegal sales tactics" that violated the FCA. *Id.* ¶ 61. In response to Tolmar's letter, Defendant's Office of Ethics and Compliance (OEC) began investigating sales practices; in September 2016, OEC searched all emails for "key phrases that could indicate AbbVie marketers engaged in problematic communications." *Id.* ¶¶ 67–68. In December 2016, OEC started interviewing sales representatives about the language that they used when discussing Lupron with physicians. *Id.* ¶¶ 78–79.

**A. Babjak**

William Lee, an OEC director, interviewed Babjak in January 2017. [SB] ¶¶ 79–80. Before the interview began, Lee told Babjak that he would not lose his job for participating in the interview and that he did not need an attorney. *Id.* ¶¶ 83,

4

86. Lee also told Babjak not to take notes during the interview. *Id.* ¶ 85.

During the interview, Babjak "discussed his guidance to representatives on discussing average sales price" with physicians "and how those practices had been around for a long time at AbbVie." *Id.* ¶ 91. As the interview wrapped up, Babjak said that he thought Defendant's sales teams needed more guidance about discussing ASP; Lee agreed. *Id.* ¶ 94. Specifically, Babjak suggested that teams needed more information about "what pharmaceutical sales representatives could and could not say," and he offered to help create the training. *Id.* ¶¶ 95–96.

Defendant fired Babjak in May 2017. *Id.* ¶ 99. When Babjak asked for an explanation, Defendant's HR office referred him to his OEC interview. *Id.* ¶ 100. After Babjak's firing, Defendant told other members of its sales force that it fired Babjak because of his OEC interview, and a senior manager announced at a company meeting that Defendant needed to avoid headlines about "propping up price." *Id.* ¶ 104.

**B. Christie**

Lee also interviewed Christie in January 2017. [TC] ¶ 82. As with Babjak, Lee told Christie that he did not risk his job by participating in the interview, that he did not need an attorney, and that he could not take notes. *Id.* ¶¶ 85–89. During the interview, Lee reviewed Christie's internal emails with him and suggested that the emails showed that representatives from Christie's team had inappropriate talks with physicians about profit. *Id.* ¶ 92. When Lee disapproved of some of Christie's answers, Christie suggested that "the franchise needed more

5

training." *Id.* ¶ 98.

Defendant fired Christie the same day it fired Babjak. *Id.* ¶ 103. An HR representative explained that Defendant fired Christie for violating company policy on "unapproved messaging" in internal communications, and referred Christie to his OEC interview. *Id.* ¶ 105. At a sales meeting a month after Defendant fired Plaintiffs, a senior manager explained that Defendant "could not afford" another integrity agreement with DHHS. *Id.* ¶ 107.

### C. Schaumburg

Candice Voticky, another OEC director, interviewed Schaumburg in February 2017. [DS] ¶ 81. Before the interview, Schaumburg's manager told him to attend if he wanted to keep his job, and explained that the interview concerned an investigation about discussions of ASP with physicians. *Id.* ¶ 83. Voticky told Schaumburg that he could not take notes during the interview and did not need legal representation. *Id.* ¶¶ 86–89. Voticky and Schaumburg reviewed some of Schaumburg's internal emails before discussing training. *Id.* ¶ 98.

Schaumburg told Voticky that his team never talked about the profitability of Defendant's products, due to their training, but he said that they needed guidance "on what to specifically say when physicians ask certain questions." *Id.* ¶¶ 99–100. Schaumburg then walked Voticky through several examples of how his team would respond to profitability questions. *Id.* ¶ 101.

Defendant fired Schaumburg in May 2017 for "use of unapproved messaging." *Id.* ¶ 107. Schaumburg's former manager said that she thought Defendant unfairly

fired Schaumburg when "everyone was doing the same thing." *Id.* ¶ 109. Schaumburg cites the same examples as Babjak and Christie to suggest that Defendant fired him for discussing information during his OEC interview that showed that Defendant violated its integrity agreement with DHHS. *Id.* ¶ 113.

### D. Waring

Lee interviewed Waring in December 2016. [JW] ¶ 84. Lee told Waring that he could not take notes during the interview. *Id.* ¶ 88. During the interview, Lee questioned Waring about his understanding of what sales representatives could say to physicians regarding ASP. *Id.* ¶¶ 91–94. Waring told Lee that Defendant's marketing department previously distributed updated pricing information to sales managers on a quarterly basis, and that Defendant never told his team that they could not discuss the process for calculating ASP with physicians. *Id.*

Defendant fired Waring in May 2017 without giving him any explanation for his firing. *Id.* ¶ 99. Like his co-Plaintiffs, Waring alleges that Defendant fired him for discussing information during his OEC interview that suggested that Defendant violated its integrity agreement with DHHS. *Id.* ¶ 101.

### E. Bauerle

Bauerle interviewed with OEC's Candy Hahn in December 2016. [JB] ¶ 87. After telling Bauerle that he could not take notes during the interview, Hahn reassured him that he should not worry about getting in trouble because of the interview. *Id.* ¶¶ 90–91. Hahn questioned Bauerle about training on ASP and about numerous internal communications. *Id.* ¶¶ 92–103.

7

When Hahn concluded her questioning, Bauerle said that he wanted to make some closing comments. *Id.* ¶ 107. He told Hahn that her questions indicated that Defendant obviously had concerns about training on ASP and approved communications. *Id.* He offered to help in any way he could, including by "creating or conducting new training." *Id.* ¶ 108.

Defendant fired Bauerle in May 2017. *Id.* ¶ 113. During the phone call that ended with Bauerle's termination, the HR director read a prepared statement informing Bauerle that he violated company policy on "unapproved messaging." *Id.* ¶ 114. Again, Bauerle alleges that Defendant fired him for discussing information during his OEC interview that suggested that Defendant violated its integrity agreement with DHHS. *Id.* ¶ 116.

### F. McKinley

When Lee emailed McKinley in December 2016 to schedule an interview, McKinley asked her supervisor about the purpose of the interview. [KM] ¶ 101. Her supervisor explained that the interview was part of "an investigation sparked by the Tolmar letter," and told McKinley: "As long as no one says anything stupid, we should be fine." *Id.* ¶ 102. Lee told McKinley not to worry about termination and not to take notes during the interview. *Id.* ¶¶ 105, 109.

Lee questioned McKinley about the contents of several internal communications and about how she communicated with her team in the field. *Id.* ¶¶ 110–18. When Lee showed her an email from a sales representative that mentioned ASP and a specific physician, McKinley suggested that the sales

8

representative, new to her team, "possibly needed some more training." *Id.* ¶ 123. After more questions about pricing, McKinley said that she thought initial sales training classes taught field representatives when not to discuss pricing, but that "if there was no training on the issue, there should be." *Id.* ¶ 137.

After the interview, McKinley met with her supervisor to voice her concerns about training. *Id.* ¶ 138. Although McKinley's supervisor told her not to pursue the training issues, McKinley and Coleman then met with training managers to discuss their concerns about the consistency and accuracy of the training for Lupron sales representatives. *Id.* ¶¶ 139–41.

In March 2017, Defendant's legal counsel told McKinley that Defendant put significant pressure on its legal department to "get this completed quickly," referring to the Tolmar investigation. *Id.* ¶ 157. He also promised McKinley that he had reviewed the OEC investigation materials, and that no one would lose their job over the investigation. *Id.* ¶ 158. Defendant fired McKinley in May 2017 for violating company policy on "unapproved messaging." *Id.* ¶ 159. McKinley alleges that, during a management meeting after her firing, regional managers asked why Defendant fired her and her co-Plaintiffs instead of retraining them; a senior manager replied that "there is no appetite for another $1 billion fine." *Id.* ¶ 167.

### G. Coleman

Lee interviewed Coleman in December 2017 and told him not to take notes. [MC] ¶ 102. The interview focused upon internal communications about ASP and discussing Lupron's price with physicians. *Id.* ¶¶ 104–09. Coleman explained that

9

Defendant never provided formal training to sales representatives about what they could or could not say regarding the "erosion" of ASP. *Id.* ¶ 108.

After the interview, Coleman discussed his concerns about sales training with McKinley. *Id.* ¶ 119. As discussed above, Coleman and McKinley met with sales trainers to express their concerns about the consistency and accuracy of the training for Lupron sales representatives. *Id.* ¶ 120.

Defendant fired Coleman in May 2017 for violating company policy regarding "unapproved messaging." *Id.* ¶¶ 130–31. Again, Coleman alleges that Defendant fired him for discussing information during his OEC interview that suggested that Defendant violated its integrity agreement with DHHS. *Id.* ¶ 134.

### H. Changes to Defendant's Training Procedures

After firing Plaintiffs, Defendant "made wholesale revisions" to its training on approved messaging about reimbursement and ASP. *Id.* ¶ 138. In June 2017, Defendant provided remedial training to sales representatives that contradicted Defendant's prior instructions to Plaintiffs and their teams. *Id.* ¶ 139. For example, the training stated that sales representatives could not discuss the effect of Lupron's price on reimbursement "or otherwise use reimbursement as a reason to purchase Lupron or not purchase a competitor's product." *Id.* ¶ 142. For the first time ever, Defendant also trained sales representatives not to use certain price-related terms. *Id.* ¶ 148.

### II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Thus, "threadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

### III. Analysis

Plaintiffs claim that Defendant violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), by firing them for "providing evidence of inadequate training," other potential FCA violations, and violations of the integrity agreement. [31] at 1. Defendants argue that Plaintiffs' claims fail because Plaintiffs do not show that they engaged in protected activity. [28] at 1–2. This Court agrees.

Congress enacted the FCA to combat financial fraud against the United States. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000). Thus, the FCA prohibits knowingly presenting "a false or fraudulent claim for payment or approval" to the federal government, 31 U.S.C. § 3729(a)(1)(A), and knowingly making, using, or causing to be made or used "a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). The FCA does not, however, provide "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

Plaintiffs seeking relief under the FCA's anti-retaliation provision must show that their employer fired them, suspended them, or otherwise discriminated against them "in the terms and conditions of employment" because of their actions "in furtherance of" an FCA case or "other efforts to stop 1 or more" FCA violations. § 3730(h)(1). In other words, Plaintiffs must sufficiently allege that they engaged in conduct protected by the FCA and that Defendant fired them "because of" that conduct. *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012).

The Seventh Circuit uses a two-prong inquiry to determine whether an employee's conduct qualifies as protected under the FCA: (1) the employee must believe, in good faith, that the employer committed fraud against the government; and (2) a reasonable employee "in the same or similar circumstance" might believe that the employer committed fraud against the government. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016).

12

### A.     Subjective Prong

Babjak, Christie, Schaumburg, Waring, and Bauerle fail to allege that they knew about the Tolmar letter—which allegedly accused Defendant of using illegal sales tactics that violated the FCA—before Defendant fired them.  McKinley and Coleman knew at the time of their interviews that the letter existed, [KM] ¶ 102; [MC] ¶ 100, but neither alleges that they read the letter or otherwise knew any substantive details about its contents, *see* [32] at 17 ("Plaintiffs do not dispute that no Plaintiff knew of the substance of the 2016 competitor letter prior to their termination, and that five did not even know a letter was sent at all.").  Each Plaintiff alleges that, during interviews focused upon how the Lupron sales force interacted with physicians, they instead expressed concerns about training that led Defendant to fear that it might face another integrity agreement and large fine from DHHS.  *See, e.g.*, [DS] ¶ 113.

Plaintiffs' complaints certainly show that they believed that Defendant violated its integrity agreement with DHHS and/or the regulations that prohibit pharmaceutical sales representatives from discussing profits with physicians.  *See, e.g.*, [SB] ¶ 104; [KM] ¶ 167.  But Plaintiffs offer no explanation to connect their belief in "garden-variety breaches of contract or regulatory violations" with a good-faith belief that Defendant actually defrauded the government.  *Escobar*, 136 S. Ct. at 2003.  Indeed, Plaintiffs fail to allege that Defendant submitted *any* claims to the federal government, let alone fraudulent claims.  Ostensibly, Plaintiffs behaved laudably by voicing concerns about Defendant's training deficiencies, but the FCA's

13

anti-retaliation provision does not cover employees who merely "made an effort to stop a violation of some federal law" or regulation. *Reed v. Colo. Technical Univ.*, No. 15-cv-3368, 2016 WL 1019830, at \*3 (N.D. Ill. Mar. 15, 2016). Rather, Congress designed the provision to protect employees who have "made an effort to stop *a violation of the False Claims Act*." *Id.*

### B. Objective Prong

Even if Plaintiffs subjectively believed that Defendant defrauded the government, their claims still fail as alleged, because Plaintiffs do not sufficiently plead that a reasonable employee "in the same or similar circumstance" might believe that Defendant committed fraud against the government. *See Uhlig*, 839 F.3d at 635. The objective prong looks to the facts that the employee knew "at the time of the alleged protected activity." *Id.* (citing *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479–80 (7th Cir. 2004)).

In *Uhlig*, the Seventh Circuit held that a plaintiff who had not read the relevant contracts between his employer and the government, and who had only seen two secondhand emails explaining that the company changed its employment structure to better align "with its contractual requirements," failed to show that a reasonable employee in his position would have believed that his employer was defrauding the government. *Id.* The secondhand emails did not state the employer's contractual obligations to the government, and thus did not provide "a sufficient basis on which to satisfy the objective component of the protected-activity test." *Id.* Likewise, Plaintiffs here lack a sufficient basis to satisfy the objective

14

component of the protected-activity test. Plaintiffs apparently now know that the Tolmar letter alleged FCA violations, but the relevant inquiry looks to what Plaintiffs knew at the time of their alleged protected activity—here, that means at the time of the interviews during which they raised concerns about training. *See Fanslow*, 384 F.3d at 479–80.

As discussed above, five Plaintiffs did not know that the letter existed during their interviews. The interviews examined how Plaintiffs and their sales teams marketed Lupron, and specifically how they talked about price and profits with physicians. As alleged here, no reasonable employee could extrapolate from questions about discussing drug prices with physicians to arrive at a belief that Defendant fraudulently sought money from the federal government. *See Uhlig*, 839 F.3d at 635. Possible regulatory violations? Yes. Defrauding the government? No.

McKinley and Coleman, the two Plaintiffs who actually knew that the letter existed at the time of their interviews, fare no better. Although they knew that the letter existed, they fail to allege that they knew anything about its substance. *See* [32] at 17. Here, no reasonable employee could believe, based upon the mere existence of a letter from Defendant's competitor and the questions that the OEC interviewers asked, that Defendant fraudulently sought money from the federal government. *See Uhlig*, 839 F.3d at 635.

Although Defendant cited *Uhlig* in its opening brief and argued that Plaintiffs failed to satisfy *Uhlig's* standard for the reasons explained above, [28] at 15–17, Plaintiffs did not acknowledge *Uhlig* (or other FCA case law on protected

15

activity) in their response, *see generally* [31]. Instead, Plaintiffs labeled Defendant's argument about their lack of knowledge of the Tolmar letter "a red herring," and extensively cited Title VII case law to argue that they engaged in protected activity. *See id.* at 27–29, 39–40.

Put simply, this is not a Title VII case. No court has ever applied Title VII's retaliation standards to FCA retaliation claims, and numerous courts have rejected similar efforts to blur the lines between the two statutes. *See, e.g.*, *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 348 (4th Cir. 2010) ("But transpositional interpretation is dangerous here, all the more so because the FCA, unlike most civil rights statutes, is aimed at protecting the public fisc rather than redressing personal injuries."); *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 244 F. Supp. 3d 1138, 1143–44 (D. Colo. 2017) (labeling such arguments "unpersuasive" because of "important textual differences between the two provisions"); *Hale v. Moreland Altobelli Assocs., Inc.*, No. 1:14-cv-00065-WCO, 2014 WL 12235187, at *4 n.5 (N.D. Ga. Sept. 4, 2014) (following *Mann*, 630 F.3d at 348). This Court likewise declines to apply Title VII's standards to FCA retaliation claims. *Uhlig* controls, and under that standard Plaintiffs fail to plead that they engaged in protected activity.

## IV. Conclusion

This Court grants Defendant's motion to dismiss each Plaintiff's complaint. Plaintiffs may replead their complaints if they can do so consistent with their obligations under Rule 11. Any Plaintiff who wishes to replead his or her claim must file an amended complaint by 5/11/18. Failure to correct the deficiencies

16

identified here may result in dismissal with prejudice. This Court strikes the 4/17/2018 motion hearing date, and sets the case for a status hearing on 5/16/18 at 9:45 a.m. in Courtroom 1203.

Dated: April 13, 2018

                                                Entered:

                                                John Robert Blakey
                                                United States District Judge